IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICK SANTORO and JESSICA LANDIS,**<br>**Plaintiffs,**<br>**v.**<br><br>**TOWER HEALTH,**<br>**Defendant.** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **Case No. 22-cv-4580-JFM** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Patrick Santoro and Jessica Landis ("Plaintiffs") respectfully submit the following Opposition to the Motion to Dismiss filed by Tower Health ("Defendant") [Doc. 43].

## I. INTRODUCTION

Defendant's Motion represents a skillful attempt to deflect and distract from behavior so shockingly inappropriate, unethical, and illegal that most health systems would never even consider it. Put succinctly, Defendant engaged in a concerted, intentional effort to collect individually-identifiable health information from people interacting with its website, and sell this information to a social media company intent on generating revenue by bombarding them with ads targeted to their specific, individual health concerns.[1] This behavior is particularly egregious and shocking for multiple reasons, including that:

- Defendant's public-facing representations consistently promise to keep patients' personal health information private, confidential, secure, and protected against unauthorized use absent notice and

[1] HIPAA, 43 U.S.C. § 1320(d)(6), defines "individually-identifiable health information" as: "any information, including demographic information collected from an individual, that— (A) is created or received by a health care provider… and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."

express consent;

- long-standing guidance from the U.S. Department of Health and Human Services' ("HHS") expressly requires hospitals not to share individually-identifiable health information collected by their websites, because this information "relates to the individual's past, present, or future health or health care or payment for care," HHS Bulletin, pp. 2-3 (Exhibit 1); and

- hospitals are supposed to be in the business of receiving information to enable their provision of the most informed, effective medical treatments, not sharing this information with outside parties or, even worse, selling this information to a social media company as fodder for unsupervised marketing efforts.

Because it cannot offer any *bona fide* ethical or rational justification for its behavior, or refute any of the material facts underlying Plaintiffs' claims, Defendant is left trying to hide behind a series of factually-incorrect and irrelevant arguments, including that: "a visitor's browsing activity on Tower's public website [is] not health information," Def. Mem. at p.1 [Doc. 43-2]; Defendant's conduct is shielded by policies that allow Meta to collect and use information from Plaintiffs' Facebook accounts, *id*. at pp.1-2; and Plaintiffs have pled no facts to support their claims, *id*. at p. 2 ("the SAC… rests entirely on bare, conclusory allegations") [Doc. 43-2]. As Plaintiffs discuss at length below, none of these arguments changes the fact that their SAC includes detailed, extensive factual allegations describing plausible ECPA, negligence, and privacy claims that, taken together and viewed under the applicable standard, are adequate to survive Defendant's Motion. SAC, ¶¶ 10-54, 62-110 [Doc. 40].

## II. LEGAL STANDARD

Rule 8(a)(2) requires pleadings to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Chaleplis v. Karloutsos*, 2023 WL 2976277, *2 (E.D. Pa. Apr. 18, 2023). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Holland v. Progressive Specialty Insurance Co*., 2023 WL 2868012, *1 (E.D. Pa. Apr. 10, 2023), *citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

## III. ARGUMENT

### A. Defendant Falsely Claims Its Meta Pixels Do Not Capture Communications

In the "Background" section of its Memo, Defendant acknowledges Plaintiffs' allegations that it: operates a website available to the general public containing Meta Pixels that capture both the characteristics and content of all visitors' interactions on, and communications with, its website. *Cf.* Def. Mem. at p.3 [Doc. 43-2] *with* SAC at ¶¶10-11, 16, 23-24 [Doc. 40]. However, Defendant jumps from acknowledging these facts to concluding, without any basis, that it did not use Meta Pixels to capture any communications, Def. Mem. at p.3 (Meta Pixel used "to capture information about a website user's interactions—not communications themselves") [Doc. 43-2], and that individually identifiable health information cannot be entered on its website, *id.* (MyTowerHealth patient portal is "the only website where individually identifiable health information may even be entered"). These conclusions represent a stark, unjustified departure from Plaintiffs' allegations.[2]

[2] In an obvious attempt to minimize its flagrant abuse of Plaintiffs' privacy rights, Defendant repeatedly characterizes Plaintiffs' interactions with its website as "browsing" or "navigating." Def. Mem. at pp. 1, 8, 15-17, 19-20, 24-25 [Doc. 43-2]. In contrast, Plaintiffs have pled that their interactions with Defendant's website were "communications" with Defendant, because their use of the site involved interacting with buttons, links, pages, and tabs to request information and being directed to pages on Defendants that responded by providing the requested information. SAC at ¶¶24-26 [Doc. 40]. In addition, Defendant's website also requires visitors to enter their personal

Plaintiffs have alleged that the Meta Pixels on Defendant's website are designed to capture extensive information about everyone who uses this website, including their IP address, Facebook ID, cookie identifiers, device identifiers, and account numbers. SAC at ¶¶3, 23, 26 [Doc. 40]. This information enables Defendant to know the identity of everyone who interacts with its website. *Id.* at ¶¶3, 12, 28. Plaintiffs have also alleged that, by viewing and selecting specific pages, tabs, buttons, and links on Defendant's website, visitors engage in substantive communications with Defendant, requesting and receiving information about specific healthcare-related topics of interest to them. *Id.* at ¶¶25-26 (explaining how website users communicate their interest in healthcare-related topics to Defendant and receive the requested information from Defendant).[3] Plaintiffs also point out that Defendant's website is set up to literally communicate with all visitors by providing a "virtual assistant" on every webpage, providing the option for real-time personal interactions on any health-related topic guided by auto-filled "topic" buttons (*i.e.*, "cancer care" or "chemotherapy") auto-populated based on pages that visitor has already viewed.

As a result, Defendant is obviously engaging in communications with visitors to its website and using meta pixels to capture information from these communications.

### B. Defendant Falsely Claims That Its Meta Pixels Only Collect Anonymous Information

Defendant repeatedly claims, without any factual support, that the Meta Pixels on its website only collect "anonymous" information. Def. Mem. at pp. 4, 14, 21, 24-25 [Doc. 43-2].

---

information (*i.e.*, name, date of birth, address, contact e-mail, phone number, and medical area of interest) to request an appointment.

[3] Plaintiffs have also alleged that the HHS has long warned healthcare providers against installing tracking technologies on their websites, the very thing Defendant chose to do here, precisely because "[t]racking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions… or that permits individuals to search for doctors or schedule appointments," may have access to protected health information when such tracking technologies collect information that identifies the individual." SAC at ¶40 [Doc. 40].

This claim defies common sense. If Meta Pixels truly collect only "anonymous" information, why have Meta and Defendant devoted substantial resources (and risked significant liability) to develop and implement this scheme? What value does truly "anonymous" information have to a social media company intent on building-out its user profiles and selling targeted ads? More practically, why have defense counsel not proactively initiated conferrals to share information demonstrating the "anonymous" nature of Defendant's data collection to support a stipulated withdrawal? The easiest answer to all these questions, discussed at length in Plaintiffs' SAC and throughout this Opposition, is that the Meta Pixels on Defendant's website do not just capture "anonymous" information.

Plaintiffs have pled that Defendant's Meta Pixels capture the "characteristics" of all communications on Defendant's website, including Plaintiffs' and the Class members' individual IP addresses, Facebook IDs, cookie identifiers, device identifiers and account numbers. SAC at ¶¶ 23, 40-41 [Doc. 40]. Beyond this, Plaintiffs have pled that Defendant's Meta Pixels capture all the information (*i.e.*, name, date of birth, address, contact e-mail, phone number, and medical area of interest) Plaintiffs and the Class members enter, either to request appointments on Defendant's website or communicate with Defendants' "virtual assistant." *Id.* at ¶¶ 3, 40. *See* Section III(d)(iv), below.

All these allegations are consistent with the HHS Bulletin that represents the federal government's best and most current guidance on the perils of tracking technology in the healthcare context. *See* SAC at ¶¶ 36-42 [Doc. 40]. The HHS Bulletin expressly warns that tracking technologies can access, and routinely do access, protected health information:

> tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions [or] permits individuals to search for doctors or schedule appointments, may have access to protected health information when such tracking

> technologies collect information that identifies the individual…. [and] *even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services, because the information collected from these communications connects the individual to the regulated entity* (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), *and thus relates to the individual's past, present, or future health or health care or payment for care*.

*Id.* at ¶¶ 40-41 (emphasis added).

At the motion to dismiss stage, it is improper for the Court to make findings of fact to resolve contested issues like whether Defendant's Meta Pixels capture only anonymous information. *See T.D.H. v. Kazi Foods of New Jersey, Inc*., 2023 WL 4567722, *4 (E.D. Pa. July 17, 2023) (drawing inferences to resolve contested facts is improper at the motion to dismiss stage); *Stirone v. McHutchison Inc*., 2018 WL 1256777, *4 (W.D. Pa. Mar. 12, 2018) (defendant's argument relies on contested facts not in evidence, so is premature); *Wormack v. Shinseki*, 2010 WL 2650430, *1 (W.D. Pa. July 1, 2010) ("a court, when evaluating a motion to dismiss, accepts as true all of a plaintiff's factual allegations"), *citing Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

**C. Defendant Falsely Claims That The Meta Pixels On Its Website Are An "Ubiquitous Part Of Internet Commerce" Relying On Non-Existent Support From The SAC**

In the "The Meta Pixel" section of its Memo, Defendant presents an unfairly-stilted picture of Meta Pixels as a ubiquitous, harmless marketing tool. Def. Mem. at pp.4-5 [Doc. 43-2]. Defendant can paint this glowing portrait only because its discussion is limited to a discussion of generic "interactions" on generic "websites," and does not relate to the use of Meta Pixels in a healthcare setting, which has long been considered problematic.

Defendant operates a healthcare system, so it is a "regulated entity" under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Thus, unlike the owner of an office supply website, Defendant is subject to HIPPA rules when using online tracking technologies and is expressly prohibited from "[using] tracking technologies in a manner that would result in impermissible disclosures of protected health information to tracking technology vendors or [lead to] any other violations of the HIPAA Rules." HHS Bulletin at p. 1 (Exhibit 1). Defendant's discussion of the Meta Pixel does not account for the fact that Plaintiffs' claims arise in the healthcare context where specific, additional limitations are placed on the use of tracking technologies. However, this is not the only problem with this section of Defendant's memo.

To give the (obviously false) impression that Defendant's analysis is consistent with Plaintiffs' allegations, Defendant's discussion of Meta Pixels contains no fewer than eleven references to Plaintiffs' SAC. *See generally* Def. Mem. at pp. 4-5 [Doc. 43-2]. A close examination of these cites – or really any examination at all – reveals that Defendant's assertions and conclusions have no support in, or even any relation to, the cited allegations in Plaintiffs' SAC. For example:

- Defendant explains that "entities like Meta often use pixel data in conjunction with cookies—small pieces of text—to gather information about their users' browsing histories," *citing* SAC ¶¶ 12 and 27 [Doc. 40], but these paragraphs offer no support for this statement and do not mention cookies or browsing histories;

- Defendant explains that "the Meta Pixel works" by giving Meta permission to place cookies on browsers that are used to identify users, *citing* SAC ¶13, but this paragraph offers no support for this statement and says nothing about browsers, cookies, or how Meta identifies Facebook users; and

- Defendant explains that the Meta Pixel gathers "anonymous information" about visitors' interaction with a website, *citing* SAC ¶¶11-13, but these paragraphs have nothing to do with this statement, or with whether Meta Pixels gather "anonymous information."

As a result, the Court should completely disregard Defendant's discussion of "The Meta Pixel" as a thoroughly misleading, confused, and unreliable exposition with no relevance to this action, or any support in the evidentiary record.

### D. The Complaint Pleads A Plausible ECPA Claim Against Defendant

To state a claim under the ECPA, Plaintiffs must allege that Defendant: "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." *In re Google Inc. Cookie Placement Consumer Priv. Litig*., 806 F.3d 125, 135 (3d Cir. 2015), *quoting In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 18 (1st Cir. 2003), *citing* 18 U.S.C. § 2511(1)(a). Defendant challenges the first, second, and third elements of Plaintiffs' ECPA claim (*i.e.*, that it intentionally intercepted the contents of covered communications). These arguments are broadly met by Plaintiffs' allegations that Defendant intentionally installed Meta Pixels on its website to intercept and disclose to Meta the contents of electronic communications containing statutorily-protected, individually-identifiable health information, *see generally* SAC [Doc. 40], as discussed below.

#### i. Plaintiffs Have Pled Facts Plausibly Suggesting That Defendant Is Liable Under The ECPA's "Criminal Or Tortious Exception"

Defendant argues it did not "intercept" Plaintiffs' communications on Defendant's website, because it was an intended recipient of these communications. Def. Mem. at pp.6-7 [Doc. 43-2]. This argument ignores the true nature of Plaintiffs' "interception" theory. In short, Plaintiffs allege that, although Defendant is a party to communications on its website, it violated the ECPA by knowingly disclosing individually-identifiable health information Plaintiffs and the Class members communicated on its website to Meta for commercial purposes – in violation of the

ECPA's criminal or tortious exception.[4] *See* 18 U.S.C § 2511(2)(d); 42 U.S.C. § 1320(d)(6); SAC at ¶¶ 64-69 [Doc. 40].

It is a federal crime to "knowingly" disclose "individually identifiable health information" to third parties. *See* 42 U.S.C. § 1320d(6).[5] Although Defendant characterizes the information as "anonymous" and "not communications," it does not deny disclosing information collected from its website to Meta. SAC at ¶¶ 3, 11-12, 27-28 [Doc. 40]; Def. Mem. at pp.6-10 [Doc. 43-2]. Because these characterizations have little factual support, Defendant falls back on the additional argument that Defendant did not "intercept the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording," as the ECPA requires. Def. Mem. at p. 9, *quoting In re Google Cookie Placement Consumer Priv. Litig.*, 806 F.3d at 145; *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010).[6] This argument is based on a mistaken premise: that the "interception" and "disclosure" Plaintiffs have pled are the same event.

The ECPA defines "interception" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510 (4). Plaintiffs have specifically pled facts describing how Defendant intercepted (*i.e.*, acquired) the contents of multiple types of communications on its website. *See*

---

[4] For example, courts have interpreted the "criminal or tortious purpose" provision in 18 U.S.C § 2511(2)(d) to prohibit wiretaps which were conducted with a criminal or tortious purpose beyond the intent to commit a wiretap violation itself. Def. Mem. at p. 7 [Doc. 43-2].

[5] Notably, "covered entities . . . may be prosecuted directly under 42 U.S.C. § 1320d-6" and "the 'knowingly' element of the offense set forth in that provision requires only proof of knowledge of the facts that constitute the offense." *www.justice.gov/sites/default/files/olc/opinions/attachments /2014/11/17/-hipaa_final.htm.*

[6] Defendant conspicuously fails to mention that the plaintiffs' ECPA claims in these cases were dismissed because, unlike Plaintiffs here, they did not plead an independent tortious use separate from the defendants' act of interception. *See In re Google Inc. Cookie Placement*, 806 F.3d at 145 ("'intrusion upon seclusion presents a problem… - it is a tort that occurs through the act of interception itself'"), *quoting Caro,* 618 F.3d at 101.

SAC at ¶¶ 3, 10, 23-24, 26, 66 (Meta Pixels capture extensive information from Defendant's website visitors including their IP addresses, Facebook IDs, cookie identifiers, device identifiers, account numbers, the names, addresses, phone numbers and e-mail addresses they enter on the site, and all the information they access, communicate, request, and view through interactions with buttons, links, pages, and tabs) [Doc. 40].

The HIPAA statute defines "disclosure" as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103. Plaintiffs have specifically pled facts describing how Defendant disclosed (*i.e.*, released) all the information it acquired from communications with Plaintiffs and the Class members to Meta. SAC at ¶¶ 3, 11-12, 26 (Meta Pixels transmit information intercepted from communications on Defendant's website to Meta) [Doc. 40]. Thus, Defendant's act of intercepting or acquiring individually-identifiable health information from Plaintiffs and the Class members is independent of its unlawful disclosure of disclosing or releasing that information to Meta, and its conduct both falls squarely within – and is directly prohibited by the ECPA's criminal or tortious exception.

Tower also argues that Plaintiffs have not adequately pled it acted with a criminal, as opposed to a legitimate commercial, purpose. Def's. Mem. at p. 9 ("Plaintiffs do not allege how any commercial use of information could be a criminal or tortious purpose in violation of existing law."). This argument overlooks the obvious. Plaintiffs have pled that Defendant committed a federal crime by knowingly sharing the class members' individually-identifiable health information with Meta. SAC at ¶¶ 24-28, 36-41, 67 [Doc. 40]. The fact that Defendant's crime eventually provided it and Meta with a commercial benefit cannot possibly preclude a finding of criminal motivation. If that were true, it would be impossible to prove criminal intent for any successful bank robbery, embezzlement, or other crime involving theft. Likewise, Defendant's

authority, *Katz-Lacabe v. Oracle America, Inc.*, 2023 WL 2838118 (N.D. Cal. Apr. 6, 2023), is not relevant here because the data at issue in that case was not individually-identifiable health information and the defendant in that case was not a HIPAA-covered entity. *Katz-Lacabe*, 2023 WL 2838118 at *1 (alleging Oracle America, Inc.'s unlawful disclosure of "web browsing and other activity").

Because Plaintiffs have pled that Defendant engaged in criminal conduct by knowingly disclosing Plaintiffs' and the Class members' individually-identifiable health information to Meta without their notice or consent, Plaintiffs have adequately alleged that Defendant illegally intercepted their communications in violation of the ECPA. SAC at ¶¶ 23-24, 67 [Doc. 40]. *See* 18 U.S.C. § 2510(4); 18 U.S.C. § 2510(8); 18 U.S.C. § 2511(1)(a); 42 U.S.C. § 1320(d)(6); 45 C.F.R. § 160.103. *See also In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014); *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 18 (1st Cir. 2003); *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, *11 (N.D. Cal. Dec. 22, 2022).

**ii. Plaintiffs Have Not Consented to The Interception of Their Communications Containing Protected Health Information.**

Defendant argues it cannot be held liable for intercepting communications under the "one party consent exception" to the ECPA, claiming "Tower consented to the Meta Pixel's disclosure of information… [t]he Court may dismiss the Wiretap Act claim on this ground alone." Def. Mem. at p.7 [Doc. 43-2]. This argument disregards Plaintiffs' allegations, misconstrues relevant authority, and ignores the clear text of the ECPA.

The ECPA provides that an electronic communication may be intercepted where "one of the parties to the communication has given prior consent to such interception *unless* such communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2510(8) (emphasis added). As Plaintiffs allege in the SAC, and explain in Section III(c)(i)

above, regardless of whether Defendant and Meta are parties to Plaintiffs' communications, and regardless of whether Defendant consented to the interceptions, Defendant remains liable under the "criminal or tortious" exception, because it intercepted Plaintiffs' and the Class members' communications with the intent to violate HIPAA. SAC ¶¶ 3, 23-28, 64-65 [Doc. 40]. Defendant boldly cites the *Peruto* case for the proposition that "unilateral consent is sufficient" to avoid an ECPA claim, hoping that neither Plaintiffs nor the Court would read the next six words from this opinion: "unilateral consent is sufficient *in the absence of tortious intent.*" *Cf.* Def. Mem. at p. 7 *with Peruto v. Roc Nation*, 385 F. Supp. 3d 384, 391 (E.D. Pa. 2019) (emphasis added). So, under *Peruto*, Tower's consent to the interception of Plaintiffs' and the Class members' individually-identifiable health information is invalidated by its tortious intent in sharing those communications with Meta without notice or consent.

Defendant proceeds to brazenly claim that Plaintiffs and the Class members consented to the disclosure of their protected health information to Meta by virtue of registering for a Facebook account and agreeing to Facebook's data sharing policies. Def. Mem. at p.7 [Doc. 43-2]. This argument is easily refuted by Tower's own authority, *In re Meta Pixel Healthcare Lit*., which examined the same Facebook policies Defendant identifies here and squarely rejected this very argument, holding: "[Meta's] generalized notice is not sufficient to establish consent" to the disclosure of private health information. *In re Meta Pixel Healthcare Lit*., 2022 WL 17869218 at *9. In reaching this conclusion, the same opinion also holds that Facebook's Terms of Use and Pixel data sharing policies do not provide a valid basis for consent, because the average person would not assume or understand that a social media company had access to their protected health information:

> I am skeptical that a reasonable user who viewed Meta's policies would have understood that Meta was collecting protected health

> information… *even if* a reasonable Facebook user would have understood that Meta's data collection included health information from their medical provider, that must still be squared with its representation that it 'requires' any third-party to have 'lawful rights to collect, use and share your data before providing any data to us.'

*In re Meta Pixel Healthcare Lit*., 2022 WL 17869218 at *9 (citations omitted). Accordingly, Meta's data sharing policies simply do not provide a basis for establishing Plaintiffs' consent to the interception or disclosure of their private health information by Defendant.

#### iii. Plaintiffs Have Pled Facts Plausibly Suggesting That Defendant Acted Intentionally

Defendant claims that Plaintiffs have not adequately pled the element of intentional action, because the SAC does "not allege even the most basic facts" suggesting that Defendant's "alleged conduct [was its] conscious objective." Def. Mem. at p.10 [Doc. 43-2]. This is a frivolous claim without any basis in Plaintiffs' pleading.

Plaintiffs' SAC contains extensive allegations supporting a finding that Defendant consciously and intentionally sent Meta individually-identifiable health information from its website, including that:

- The HHS has, for decades, warned healthcare providers against using tracking technology on their websites because of the risks of exposing protected health information and prohibited healthcare providers from sharing health care information, medical records, and related information with third parties except as needed for treatment, payment, or with their consent, SAC at ¶¶ 1, 36-42 [Doc. 40];

- Defendant has repeatedly and consistently made public-facing statements acknowledging that "information about you and your health is personal" and promising "to protect your health information," including in its Patient Rights & Responsibilities, Notice of Privacy Practices, Confidentiality Information Agreement, and Website Privacy Policy, *id.* at ¶¶ 17-22;

- Defendant has made public-facing statements expressly promising that "information [it] collects on [its] website will not be sold or

given to a third party and will be accessible only by Tower Health," *id.* at ¶22;

- Defendant designed and maintained a public-facing website that encourages its patients and members of the general public to provide and receive individually-identifiable health information, *id.* at ¶¶6, 16; and

- Meta paid Defendant, and worked cooperatively with Defendant, to design and place computer code on the Tower Health website that would intercept and transmit communications including individually-identifiable health information from Defendant's website to Meta for commercial use without providing any notice to, or receiving any consent from, Defendant's website users despite knowing that Meta was not a participant in, or an intended recipient of, the subject communications, *id.* at ¶¶3, 6, 11-12, 23-35, 65-67.

Together, these allegations include facts suggesting Defendant intentionally captured, transmitted, and shared individually-identifiable health information from its website with Meta as a conscious objective, for profit, without notice or consent, and in direct contravention of the ECPA.

**iv. Plaintiffs Have Pled Facts Plausibly Suggesting That Defendant Intercepted The Contents Of Communications On Its Website**

The ECPA broadly defines "contents" to include "any information concerning the substance, purport, or meaning of [an electronic] communication." 18 U.S.C. § 2510(8). As discussed in Section III(A), above, Plaintiffs have alleged that, by viewing and selecting specific pages, tabs, buttons, and links on Defendant's website, people engage in substantive communications with Defendant through its website, requesting and receiving information about specific healthcare-related topics relevant to them. SAC at ¶¶25-26 [Doc. 40]. Plaintiffs have also specifically pled that the Meta Pixels Defendant installed on its website captured both the "contents" of these communications (*i.e.*, the individually-identifiable health information communicated by the buttons, links, pages, and tabs website visitors click and view) and their

"characteristics" (*i.e.*, IP addresses, Facebook ID, cookie identifiers, device identifiers and account numbers), *id.* at ¶¶3, 10, 23, 26, 66, both of which meet the ECPA's definition of "contents."

To avoid liability on Plaintiffs' ECPA claim, Defendant argues that the contents it intercepted and disclosed to Meta do not convey the "substance, purport, or meaning" of communications on Defendant's website. Def. Mem. at p. 11 [Doc. 43-2]. This argument ignores the true nature of the information (*i.e.*, content) Plaintiffs and the Class members communicated to Defendant in their interactions with its website. The example in Plaintiffs' SAC illustrates the scope and specificity of this information. SAC at ¶ 24 [Doc. 40].

If a patient visits Defendant's website looking for information on breast cancer treatments, they begin on the "Services & Conditions" page, *https://towerhealth.org/services*, click the "Cancer Care" button and are directed to a page, *https://towerhealth.org/services/cancer-care*, with fifteen "cancer care services," each with separate links. Clicking on the "breast cancer" link leads to a new page, *https://towerhealth.Org/services/breast-cancer,* discussing types of breast cancer, methods for diagnosing breast cancer, and multiple breast cancer treatments. Clicking on the "radiation therapy" link leads to a new page, *https://towerhealth.org/services/radiation-therapy*, that describes eight different "radiation treatment options," identifies multiple factors relevant to this treatment, and has large buttons allowing the viewer to view "Cancer Care Providers," "Cancer Care Locations," and "Request an Appointment." Clicking the "Provider" button leads to a page, *https://towerhealth.org/providers?find_doctor_search_2=%22 pediatric+ hematologyoncology%22+%22radiation+oncology%22+%22gynecologic+oncology%22+%22 medical+oncology%22+%22cancer+surgery%22+*, with links, information, and appointment requests for Defendant's 53 cancer care providers. Clicking the "Location" button leads to a page, *https://towerhealth.org/locations?f[0]=services:Cancer%20Care*, presenting links, information

and directions to Defendant's eight cancer care locations. Clicking the Appointment button leads to a new page, *https://www.mytowerhealth.org/mytowerhealth//publicforms.asp?mode=showform &formname=ApptReqCntrPublic*, that asks the patient to enter their name, date of birth, address, contact e-mail, phone number, and medical area of interest to request an appointment. This example describes just one of the hundreds (if not thousands) of paths available on Defendant's website and explains how Defendant's website enabled a wide array of ("question and answer"-type) communications involving individually-identifiable health information meeting the ECPA's broad definition of "contents," 18 U.S.C. § 2510(8).

Several courts have agreed that these same types of disclosure constitute "content" under the ECPA. Notably, in the consolidated lawsuit challenging the use of Meta Pixels on hospital websites nationwide, the court specifically rejected Meta's argument that a website address, or Uniform Resource Locator ("URL"), that identifies the page an individual has viewed, "function[s] like an address, not contents of a communication" and held that the same types of disclosure Plaintiffs allege here qualify as "content." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 at *11.[7]

[7] As *In re Meta Pixel Healthcare Litig.* explains, 2022 WL 17869218 at *11, even Defendant's cited authorities support Plaintiffs' side of this argument: "[T]he kinds of descriptive URLs identified in the Smith Decl. are "contents" within the meaning of the statute. Unlike in *Zynga*, the URLs at issue here would not merely reveal the name of a Facebook user or group—as Smith explained, the transmitted URLs include both the "path" and the "query string" [citations omitted]. These items are content because they concern the substance of a communication. *See Zynga*, 750 F.3d at 1107; *In re Google Inc. Cookie Placement Consumer Priv. Litig*., 806 F.3d 125, 137 (3d Cir. 2015) ("If an address, phone number, or URL is... part of the substantive information conveyed to the recipient, then by definition it is 'content'"); *see also In re Google RTB Consumer Priv. Litig*., 2022 WL 2165489, *10 (N.D. Cal. June 13, 2022) (finding that categories of the website, categories that describe the current section of the website, and referrer URL that caused navigation to the current page constituted "content").

Similarly, the recent HIPAA guidance cited in Plaintiffs' SAC expressly recognizes that the tracking technologies installed on Defendant's website collect the contents of communications including individually-identifiable health information:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions… or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI ["protected health information"] in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

*https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html*. ("HHS Guidance").[8] It is important to note the HHS Bulletin does not create any *new* obligations or duties. Instead, it was issued to *remind* covered entities like Defendant of their long-standing obligation to protect communications seeking healthcare information from a HIPAA-covered entity's website. *Id.* ("it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors"). These HHS regulations provide further support that Defendant has not intercepted and disclosed simple "record information," but rather the contents of patient communications that convey the substance of their requests for substantive healthcare information from a HIPAA-covered entity's website. This precedent all demonstrates that Plaintiffs have plausibly pled a violation relating to statutorily-protected "contents" communicated on Defendant's website.

Defendant's final baseless claim on this topic is that: "without identifying a single page they visited on Tower's website, Plaintiffs' [] bald assertions that the URLs, buttons, links, pages,

---

[8] "Individually-identifiable health information" is included within HIPAA's definition of "protected health information." 45 CFR § 160.103.

and tabs they viewed are 'individually-identifiable health information' that was transmitted to Meta… [are] insufficient as a matter of law." Def. Mem. at p. 11 [Doc. 43-2]. Even a cursory review of the SAC reveals the presence of the information Defendant claims is "missing" and supports Plaintiffs' ECPA claim. SAC at ¶¶ 43, 49 (describing the communications Plaintiffs made on Defendant's website, including "requests for information about specific Tower Health providers and locations, and information about specific health conditions, treatments, and medications") [Doc. 40]. *See id.* at ¶¶ 3, 41, 23-26, 65 (describing "communications about individual patients' past, present, and future medical conditions, concerns, symptoms, appointments, providers, treatments, medications, bills, and insurance").

If Defendant really means to suggest a plaintiff should have to plead the specific details of every medical condition and treatment they communicated about with every provider on its website, this argument has no place in a motion to dismiss. A plaintiff need not share the intimate details of his or her healthcare-related communications in a complaint. To survive a motion to dismiss, it is only necessary to plead sufficient factual matter, accepted as true, to state a plausible claim for relief. *Holland v. Progressive Specialty Insurance Co.*, 2023 WL 2868012, *1 (E.D. Pa. Apr. 10, 2023) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). Requiring patients to disclose their statutorily-protected, individually-identifiable health information as a condition of pleading an action for the misuse of that information would violate the protections of HIPAA, violate Plaintiffs' privacy rights, and undermine the private, protected nature of this information. Nor would it materially inform the nature of Plaintiffs' allegations, because the contents of the healthcare-related communications on Defendant's website – whether they relate to an ingrown toenail or cancer – are equally personal, private, protected by HIPAA,

and not necessary to plead a plausible ECPA violation. For all the reasons stated above, Plaintiffs have pled facts outlining a plausible ECPA claim, so the Court should deny Defendant's motion to dismiss this claim.

**E. The Complaint Pleads A Plausible Negligence Claim**

A plaintiff must plausibly plead four elements to support a negligence claim: a duty or obligation recognized by law; a breach of that duty; a causal connection between the conduct and the resulting injury; and actual damages. *Speicher v. Rocket Mortgage, LLC*, 2023 WL 2890154, *4 (E.D. Pa. Apr. 11, 2023). Defendant challenges the second, third, or fourth of these elements (*i.e.*, that it breached a duty of care and caused damages) and adds a throw-away argument based on the economic loss doctrine.[9] Def. Mem. at pp. 13-18 [Doc. 43-2]. These arguments are met by Plaintiffs' allegations that Defendant disclosed to Meta, without notice or consent, the contents of electronic communications containing statutorily-protected, individually-identifiable health information, causing discernable economic harm. *See generally* SAC [Doc. 40].

**i. Defendant breached its duty to protect Plaintiffs' individually-identifiable health information by putting this data to multiple commercial uses without notice or consent**

Defendant argues it has not violated any duty of care owed to Plaintiffs or the Class members because "Plaintiffs never disclosed individually-identifiable health information," so it could not disclose such information to Meta. Def. Mem. at pp. 13-14 [Doc. 43-2]. This argument

[9] The economic loss doctrine prevents parties from recovering on a negligence claim that results solely in economic damages. *Longenecker-Wells v. Benecard Servs.*, 658 Fed. Appx. 659, 661 (3d Cir. 2016). However, the economic loss doctrine has no application where the defendant owes the plaintiff a legal duty independent from a contractual obligation between the parties. *Kroeck v. UKG, Inc.*, 2022 WL 4367348, *5 (W.D. Pa. Sept. 21, 2022), *citing Dittman v. Univ. of Pittsburgh Med. Ctr.*, 196 A.3d 1036, 1054 (Pa. 2018). Here, Plaintiffs' and the Class members' use of Defendant's website is not governed by a contract, *see* SAC at ¶¶74-82 [Doc. 40], so Defendant's duties arise independent from a contractual obligation and the economic loss doctrine has no possible application.

has two fatal flaws.

First, Defendant's argument ignores extensive allegations in Plaintiffs' SAC that describe the specific, individually-identifiable health information Defendant's website collected from visitors and Defendant shared with Meta. SAC at ¶¶ 3, 16-35, 43-54, 83 [Doc. 40]. This information includes all the contact information Plaintiffs and the Class members submitted to request appointments with Defendant's providers (names, addresses, phone numbers and e-mail addresses), all the information the Meta Pixels culled from Plaintiffs' and the Class members' computers (IP addresses, Facebook IDs, cookie identifiers, device identifiers, and account numbers), and all the information the Meta Pixels collected from Plaintiffs' and the Class members' substantive communications with Defendant on its website concerning the specific healthcare-related topics of interest to them. *Id.*

Second, Defendant's argument ignores Plaintiffs' substantial allegations about why Defendant and Meta engaged in this scheme: because the Meta Pixels collected individually-identifiable health information that enabled Meta to build out its individual user profiles and sell valuable advertisements targeted to Plaintiffs' and the Class members' specific medical concerns and conditions and enabled Defendant to target the ads people see on its website to their specific interests. *Id.* at ¶¶ 12, 27-28, 83-84. Plaintiffs' negligence claim is plausible, because Plaintiffs' SAC presents extensive allegations explaining how Defendant breached its duty to protect Plaintiffs' individually-identifiable health information by putting this data to multiple commercial uses without notice or consent.

**ii. Plaintiffs have pled a plausible injury**

In this Circuit, damages need not be pleaded with specificity. *Barker v. Maurus*, 2022 WL 4542104, *2 (E.D. Pa. Sept. 27, 2022). Instead, under the liberal notice pleading regime set out in

Rule 8, plaintiffs need only "provide enough specificity to give defendants notice of their possible damages." *J. Ambrogi Food Distribution, Inc. v. Teamsters Loc. Union No. 929*, 595 F. Supp. 3d 352, 358 (E.D. Pa. 2022) (citing cases). *See Sheet Metal Workers Loc. 19 v. Keystone Heating & Air Conditioning*, 934 F.2d 35, 40 (3d Cir. 1991) (Rule 8 "does not require that the demand for judgment be pled with great specificity").

Defendant acknowledges that Plaintiffs' SAC puts it on notice of five types of damages flowing from its conduct, including: (1) a loss in the value of their individually-identifiable health information; (2) embarrassment, humiliation, emotional harm, and distress from the unauthorized transmission and commercial use of their individually-identifiable health information; (3) a loss of the full value of healthcare services for which they paid, which included a duty to maintain the confidentiality of their individually-identifiable health information; (4) being deprived of fees Meta paid to gain access to their individually-identifiable health information and put this information to various commercial uses; and (5) being deprived of fees Defendant should have paid for putting their individually-identifiable health information to various commercial uses. Def. Mem. at p.15 [Doc. 43-2], *citing* SAC ¶ 84(a)-(e) [Doc. 40].

Defendant argues these "conclusory statements of harm" cannot sustain a negligence claim, because they "require assumptions to be made" about the specific value of these damages. *Id.* at pp. 15-18 (Plaintiffs' allegations require assumptions to be made about the value of Plaintiffs' browsing history, the value of medical services Plaintiffs received, the lost value of Plaintiffs' individually-identifiable health information, and the value Meta paid Defendant). The Court must reject this argument as flatly inconsistent with the applicable damages pleading standard which does not require specific allegations of value. *See Sheet Metal Workers Loc. 19*, 934 F.2d at 40; *Barker*, 2022 WL 4542104 at *2; *J. Ambrogi Food Distribution*, 595 F. Supp. 3d at 358.

Citing cases from California, Maryland, New York, and Virginia, Defendant also challenges Plaintiffs' ability to claim a loss in the value of their individually-identifiable health information. Def. Mem. at pp.15-16 [Doc. 43-2]. A recent decision from this Court concerning the mis-handling of personal health information, *Opris v. Sincera Reproductive Medicine*, is particularly instructive. In *Opris*, a hacker gained access to a healthcare provider's computer network holding patients' personal identifiable information and protected health information, including driver's license numbers, medical diagnosis and treatment information, prescription information, treating and referring physician information, and health insurance information and posted some of this information to a third-party ransomware website. *Opris v. Sincera Reproductive Medicine*, 2022 WL 1639417, *1 (E.D. Pa. May 24, 2022). The defendant eventually contained this breach and later informed the plaintiffs "their [information] may have been exposed to third parties." *Id.* The plaintiffs filed a negligence claim and (as here), without pleading any specific piece of data was disclosed or putting a specific value on their injuries, (as here) claimed damages relating to the negligent handling of their information. *Id.* at *6.[10] The defendant moved to dismiss arguing (as here) that the plaintiffs had not pled an actual injury. *Id.* at *3, 6. After a detailed analysis including a discussion of cases recognizing the property value of disclosed personal information, the court held the plaintiffs had suffered damages relating to the "loss of value to their PII and PHI." *Opris*, 2022 WL 1639417 at *8. *See In re Wawa, Inc. Data Sec. Litig.*, 2021 WL 1818494, *5 (E.D. Pa. May 6, 2021) (denying motion to dismiss negligence claim based on allegations that defendant violated a duty to protect sensitive payment card information).

[10] The plaintiffs' damages included: "theft of their PII and/or PHI, the costs of credit monitoring and identity theft detection services, lowered credit scores, costs associated with time spent and the loss of productivity due to certain actions to protect against further harm, such as finding fraudulent charges and cancelling and reissuing cards, loss of value to their PII and PHI, and the increased and continued risk of exposure to hackers and thieves of their PII and PHI."

Under *Opris*, Plaintiffs have pled plausible damages flowing from Defendant's breach.

Defendants also argue that Plaintiffs have somehow failed to plead damages because use of Defendant's website "is free." Def. Mem. at p.17 [Doc. 43-2]. The Court can easily disregard this nonsensical argument. Plaintiffs do not claim to have paid money to use Defendant's website, or seek to recover money paid to use Defendant's website. *See generally* SAC [Doc. 40]. However, the fact that using Defendant's website was "free" does not mean Defendant's conduct (*i.e.*, using Meta Pixels to negligently disclose Plaintiffs' and the Class members' individually-identifiable health information to Meta) is either free from economic harm, or insulated against a negligence claim. *See e.g., In re Yahoo! Inc. Customer Data Sec. Breach Litig*., 313 F. Supp. 3d 1113, 1138 (N.D. Cal. 2018) (discussing damages related to free internet services); *Qwest Commc'ns Co., LLC v. Free Conferencing*, 990 F. Supp. 2d 953, 973 (D. Minn. 2014) (discussing damages related to free conference call services); *Learning Annex Holdings, LLC v. Rich Glob., LLC*, 2012 WL 2878124, *1 (S.D.N.Y. July 13, 2012) (discussing damages related to free seminar services).

**iii. Plaintiffs have pled a causal connection between Defendant's conduct and their injuries**

Defendant claims that Plaintiffs have not pled a causal link between Tower's negligence and their injuries. Def. Mem. at pp. 14-15 ("Plaintiffs fail to identify any… facts, to demonstrate a causal connection between Tower's use of the Meta Pixel on its public website and Plaintiffs' alleged injuries") [Doc. 43-2]. This argument is based on a seemingly intentional misunderstanding of Plaintiffs' allegations.

Plaintiffs claim to have used Defendant's website to seek information from, and communicate with, Defendant about their medical conditions concerns, symptoms, appointments, providers, treatments, medications, bills, and insurance. *See generally* SAC [Doc. 40]. Plaintiffs

allege that the Meta Pixels Defendant installed on its website captured: 1) all the information they accessed, communicated, requested, and viewed through interactions with buttons, links, pages, and tabs on Defendant's website; all the "characteristics" of these communications, including their individual IP addresses, Facebook IDs, cookie identifiers, device identifiers, and account numbers; and 3) all the identifying information (names, addresses, phone numbers and e-mail addresses) they entered on Defendant's website, either to request appointments or communicate with Defendant's "virtual assistant." *Id.* at ¶¶ 3, 10, 23-24, 26, 66. Plaintiffs further allege that Defendant negotiated an agreement under which it would send these captured communications to Meta to build-out its individual user profiles, sell valuable advertisements targeted to Plaintiffs' and the Class members' specific medical concerns, and allow Defendant to tailor the ads Plaintiffs and the Class members see on its website to their specific medical concerns – all of which caused their claimed damages. *See* Section III(D)(ii), above, *citing* SAC ¶84 [Doc. 40].

All these allegations show both that Plaintiffs' damages would not have occurred "but for" Defendant's conduct, and that Defendant's transmission of Plaintiffs' individually-identifiable health information from its website to Meta was a "substantial cause" of Plaintiff's harm. These allegations satisfy the causation pleading requirement. *See Djebe Diallo v. GEICO Advantage Ins. Co.*, 2023 WL 3689700, *4 (E.D. Pa. May 26, 2023) ("but for causation is a *de minimis* standard... under which even the most remote and insignificant force may be considered the cause of an occurrence); *Torres v. United States*, 2023 WL 2368728, *22 (E.D. Pa. Mar. 6, 2023); *State Farm Fire & Cas. Co. v. Cohen*, 2020 WL 5369626, *7 (E.D. Pa. Sept. 8, 2020).

**F. The Complaint Pleads A Plausible Privacy Claim**

To maintain a privacy claim for intrusion upon seclusion, a plaintiff must plead four elements: "(1) there was an intentional intrusion; (2) upon the solitude or seclusion of the plaintiff,

or his or her private affairs or concerns; and (3) the intrusion was substantial; and (4) highly offensive to the ordinary reasonable person." *Kostial v. Toyota of Greensburg*, 2011 WL 6090695, *6 (W.D. Pa. Nov. 15, 2011), *citing Clegg v. Falcon Plastics, Inc*., 174 Fed. Appx. 18, 28, 2006 WL 887937 (3d Cir. Apr.6, 2006).[11] Defendant offers an array of arguments against this claim, all of which either unreasonably minimize or mischaracterize its actions, so are not a reasonable indictment of Plaintiffs' allegations. Def. Mem. at pp. 18-25 [Doc. 43-2].

**i. Plaintiffs have pled an intentional intrusion into private communications**

Defendant claims that Plaintiffs have not pled facts describing an intentional intrusion, or an intrusion into a "private place," because "Plaintiffs voluntarily visited and interacted with Tower's website," which it calls "a public place." *Id.* at pp. 19-21 [Doc. 43-2]. This claim ignores *every one* of Plaintiffs' factual allegations justifying a reasonable expectation of privacy in their communications with Defendant's website, including that:

- communications seeking or informing the provision of healthcare services are universally understood to be personal, private, and deserving of the strictest confidentiality;

- these communications involve individually-identifiable health information that Tower Health was under a legal duty to shield from disclosure;

- Defendants' Notice of Privacy Practices says it is "Required by Law to Make sure that health information that identifies you is kept private" and represents that "written authorization is required prior to using or disclosing your PHI for marketing activities that are supported by payments from third parties;" and

[11] The Restatement (Second) of Torts § 652B similarly provides: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *O'Donnell v. United States*, 891 F.2d 1079, 1083 (3d Cir.1989) ("Pennsylvania courts have consistently followed the Restatement in this area of tort law"); *Yates v. Commercial Index Bureau, Inc*., 861 F. Supp. 2d 546, 551 (E.D. Pa. 2012).

- Defendant's Website Privacy Policy says it is "committed to protecting your online privacy" and that "information that Tower Health collects on this website will not be sold or given to a third party and will be accessible only by Tower Health."

SAC at ¶¶ 87-95 [Doc. 40]. Defendant's consistent representations that its website was a place for safe, secure, and private communications about individually-identifiable health information completely undermine its current arguments to the contrary and make clear that, although Defendant's website was available to the general public, it was not a "public" forum.

Against this backdrop, Plaintiffs plausibly claim a reasonable expectation that communications on Defendant's website would be private and confidential and allege that Defendant intentionally intruded into private communications on its website in three ways:

- by placing computer code that intercepted the characteristics and contents of communications that included individually-identifiable health information and transmitted this information to Meta without notice or consent;
- by using individually-identifiable health information intercepted from these communications for its own commercial purposes; and
- by allowing Meta to use individually-identifiable health information intercepted from these communications for its commercial purposes.

*Id.* at ¶¶ 96-98. Rather than addressing any of these allegations, Defendant cites two sections of the Restatement of Torts for the proposition that Plaintiffs "consented" to Defendant's public use of their private information, because they "voluntarily visited and interacted with Tower's website." This argument directly contradicts Defendant's many representations that information communicated on its website would be kept confidential, private, and secure and, further, has no application to Defendant's status as a healthcare provider with a strong legal obligation to safeguard the individually-identifiable health information at issue in this case.

Because Defendant's "no intrusion" argument has no support in the factual record, is directly contradicted by all its public-facing statements about the security of its website, and represents an offensive dereliction of Defendant's role as a healthcare provider, the Court can confidently ignore this argument.

### ii. Defendant's conduct is "highly offensive" to a reasonable person

Defendant next argues that Plaintiffs have not properly pled an intrusion upon seclusion claim, because: "they do not allege a 'highly offensive' intrusion." Def. Mem. at pp. 21-23 [Doc. 43-2]. The Court should entirely discredit this argument, because it egregiously misrepresents the factual basis of Plaintiffs' claims and Defendant's conduct, and is based on a collection of cites analyzing privacy claims outside the healthcare setting that have no relevance to this case. *Id.* (citing cases involving, for example, disclosure of video materials requested and obtained from Viacom's children's websites, phone records, the plaintiff's name and phone number, internet activity on non-healthcare related websites, locations and non-healthcare related personally identifiable information, brief descriptions of medical treatments to an insurance claim investigator related to an accident, and the receipt of unsolicited letters and phone calls).[12]

Plaintiffs brought this action to redress Defendant's highly-offensive practice of: 1) placing computer code on Defendants' website that intercepts the characteristics and contents of communications about individual patients' past, present, and future medical conditions, concerns, symptoms, appointments, providers, treatments, medications, bills, and insurance; 2) transmitting

[12] *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 294-95 (3d Cir. 2016); *Nagy v. Bell Tel. Co. of Pennsylvania*, 292 Pa. Super. 24, 436 A.2d 701 (1981); *DeAngelo v. Fortney*, 515 A.2d 594 (Pa. Super. 1986); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 502 (S.D.N.Y. 2001); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1050 (N.D. Cal. 2012); *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108 (W.D. Pa. 2019); *Gabriel v. Giant Eagle, Inc.*, 124 F.Supp. 3d 550, 572 (W.D. Pa. 2015); *Chicarella v. Passant*, 494 A.2d 1109, 1114 (Pa. Super. 1985); *Martin v. Myers*, 25 Pa. D. & C.3d 243, 245 (Pa. Com. Pl. 1981).

this data to Meta for analysis; and 3) putting this data to commercial uses benefitting both Defendant and Meta without providing any notice to, or receiving any consent from, the users of Defendant's website. SAC at ¶¶ 3, 10, 23-24, 26, 66 [Doc. 40]. Plaintiffs' SAC identifies eleven reasons why this conduct crosses the "highly offensive" threshold including, most obviously, that hospitals should not secretly share their patients' individually-identifiable health information with a social media company for commercial purposes. *Id*. at ¶¶ 99-109. Plaintiffs' satisfaction of this test is not a close call and, has been repeatedly held, provides no basis to dismiss Plaintiffs' privacy claim. *See Cousin v. Sharp Healthcare*, 2023 WL 4484441, *6 (S.D. Cal. July 12, 2023) (plaintiffs' allegation that disclosure of their sensitive health information on Sharp's appointment scheduling page is "highly offensive" sufficient to withstand dismissal); *Lacabe v. Oracle Inc.*, 2023 WL 2838118, *7 (N.D. Cal. Apr. 6, 2023) (allegations that the defendant collected "sensitive health and personal safety information," from plaintiffs sufficient to plead a "highly offensive" intrusion); *Hazel v. Prudential Fin., Inc.*, 2023 WL 3933073, at *5 (N.D. Cal. June 9, 2023) ("the Court is mindful of the Ninth Circuit's instruction that whether an intrusion is highly offensive is not typically a question that should be resolved at the pleading stage"); *In re Meta Pixel Healthcare Litig*., 2022 WL 17869218 at *16 ("Meta's policies forbid the transmission of health-related information, which the Ninth Circuit has found to be relevant in the "highly offensive" inquiry"); *Blackman v. Omak Sch. Dist.*, 466 F. Supp. 3d 1172, 1194 (E.D. Wash. 2020) (jury can reasonably conclude announcement that plaintiff resigned "for mental health reasons" is highly offensive to a reasonable person); *Grant v. U.S.*, 2011 WL 2967323 (E.D. Cal. July 19, 2011) ("As a matter of common sense, the unwanted and unauthorized access to one's medical records by a third party is highly offensive to a reasonable person").

**iii. Plaintiffs need not plead or prove specific damages to maintain an intrusion upon seclusion claim**

Defendant's final argument is that: "Plaintiffs' claim for intrusion upon seclusion also fails because they do not (and cannot) allege any actual harm or damages." Def. Mem. at p. 23 [Doc. 43-2]. This argument is misdirected.

Unlike a negligence claim, a claim for intrusion upon seclusion does not require specific factual allegations of economic harm, or proof of damages in a certain amount. Instead, for compensatory damages to attach, a plaintiff need only *claim* "mental suffering, shame or humiliation" flowing from the required *allegations* of "highly-offensive" conduct. *Amerex Envtl. Techs. Inc. v. Foster*, 2012 WL 6552828, *6 (W.D. Pa. Dec. 14, 2012).

Consistent with this case-law, Plaintiffs support their intrusion upon seclusion cause of action with extensive allegations describing eleven examples of Defendant's "highly-offensive conduct," including that the information Defendant intercepted and shared with Meta for commercial use, without notice or consent, is universally understood to be personal, private, and deserving of confidential treatment. *Id*. at ¶¶ 99-109. As a result of these actions, Plaintiffs claim damages that include "embarrassment, humiliation, emotional harm, and distress from the unauthorized transmission and commercial use of their individually-identifiable health information" and "a loss in the value of their individually-identifiable health information," among other things. *Id*. at ¶110. These damage allegations are more than sufficient to support Plaintiffs' privacy claim. *Opris*, 2022 WL 1639417 at *8 (citing cases); *In re Wawa, Inc. Data Sec. Litig*., 2021 WL 1818494 at *5; *Amerex Envtl. Techs*., 2012 WL 6552828 at *6.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully ask this Court to enter their proposed Order denying Defendant's Motion to Dismiss [Doc. 43-2].

Respectfully submitted,

Dated: August 1, 2023

*/s/ David J. Cohen*

David J. Cohen
STEPHAN ZOURAS LLP
604 Spruce Street
Philadelphia, PA 19106
(215) 873-4836
dcohen@stephanzouras.com

James B. Zouras (*pro hac vice*)
Teresa M. Becvar (*pro hac vice*)
STEPHAN ZOURAS, LLP
222 W. Adams Street, Suite 2020
Chicago, IL 60606
(312) 233-1550
jzouras@stephanzouras.com
tbecvar@stephanzouras.com

*Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused a true and correct copy of the foregoing pleading to be served on all record counsel through the Court's electronic filing system.

Dated: August 1, 2023 *⁄s⁄ David J. Cohen*